**STATE of Missouri, Respondent,**

v.

**Mae Etta ADAMS, Appellant.**

**No. ED 77553.**

Missouri Court of Appeals,
Eastern District,
Division Two.

April 24, 2001.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 5, 2001.

Application for Transfer Denied
Aug. 21, 2001.

Emmett D. Queener, Asst. Public Defender, Columbia, MO, for appellants.

Jeremiah W. (Jay) Nixon, Attorney General, Stacy L. Anderson, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JAMES R. DOWD, Judge.

Mae Etta Adams was convicted of kidnapping, § 565.110 RSMo 1994, and armed criminal action, § 571.015, RSMo 1994, on February 23, 2000. She was sentenced to concurrent terms of twenty years' imprisonment for kidnapping and five years for armed criminal action. Adams appeals, alleging that the court erred in denying her motion to suppress and in limiting her cross examination of the victim. We affirm.

Because Adams was convicted on both counts of the information, all the evidence and the reasonable inferences to be drawn therefrom must be considered in the light most favorable to the state, and all inferences and evidence to the contrary must be disregarded. *State v. McIntosh*, 559 S.W.2d 606, 607 (Mo.App.1977).

On November 6, 1997, an employee at a Richmond Heights dentist office called the police and reported that an obviously pregnant and "delirious" person was in their office claiming she had been kidnapped. Officer Craig Mueller responded to the call and interviewed the victim, 17 year-old Angela Washington. Washington appeared to be upset and incoherent. Officer Mueller noticed a rectangular indentation over her mouth and a sticky residue on her face. Washington told officer Mueller that a woman who called herself "Michelle," but who was later identified as Adams, had phoned Washington's former residence and told Washington's sister, Atonya, that she represented a pregnancy counseling center and wished to speak to Washington. Atonya gave Adams her new number. Several days later Adams, claiming to be "Michelle," called Washington and they agreed to meet at a local Mc-

Donald's. Adams promised that she would then help Washington purchase various baby supplies. Washington told Mueller that after she met Adams at McDonald's, they drove to a couple places in search of baby supplies, and then Adams abducted her at gunpoint, stuffed her in the trunk of a car and drove her to a residence with a shed in the backyard. Washington said that Adams handcuffed her to a pole in the shed, gave her some blankets, bound her mouth with duct tape, and left her there overnight.

Officer Mueller, suspecting that Washington may be suffering from mental problems, called her sister, Atonya, who told him that Washington was not mentally disturbed, and confirmed Washington's story that she had received a call from a woman calling herself "Michelle" claiming to be a pregnancy counselor. Mueller then returned to Washington, who told him that "Michelle" said that she and her husband (Leonard) were going to hold her until she gave birth to the baby, take the baby, and then kill her.[1] Washington said that after she escaped from the shed, she climbed over a fence, left the duct tape and a blue dress by the fence, and ran to the dentist's office.

Mueller and Washington then drove to where Washington had climbed the fence and found the duct tape and blue dress. From a parking lot adjacent to the fence, Washington pointed to a shed behind the fence and told Mueller that she had been held captive there. Mueller asked Washington if she could describe "Michelle" and Leonard. Washington had never seen Leonard, but described "Michelle" as a middle-aged black woman with a chubby face and a long, black ponytail. Washington also told Mueller that "Michelle" had a

.25 caliber silver handgun with a black handle that she kept in a blue coat.

Mueller then jumped the fence and looked through the door of the shed. Inside the shed he saw handcuffs and blankets under a pole, just as Washington had described. Mueller returned to the car and called for support. Mueller's supervisor, Sargent Cromer, was the first to arrive. Cromer and Mueller believed that the suspects may have already, or would soon discover that Washington had escaped and then flee or destroy evidence. So they elected to enter the property and secure the area without a warrant. Mueller climbed back over the fence and Cromer called for backup before driving around to the front of the house, where other officers were arriving.

As Mueller approached the house from the rear he saw a woman matching "Michelle's" description through a window. He pulled his weapon and ordered her to come to the back door. She appeared at the screen door, but failed to come out. Mueller then opened the screen door and arrested Adams. Mueller escorted her to the driveway along the side of the house and notified the others that "Michelle" had been apprehended, but that he had not located Leonard or the firearm. Mueller handed Adams over to another officer, returned to his car and brought Washington to the front of the house, where she identified Adams as "Michelle."

While Mueller was doing this, Cromer and other officers decided to do a "protective sweep" of the house in the event that Leonard might be inside and armed. Upon entering the house, Cromer noticed a blue coat matching the description given by Washington hanging from a chair. He

---

1. Washington was in the very last stages of her pregnancy and gave birth only two days

after this incident.

patted it down and found a handgun. On top of the coat was a sweater, which Cromer also patted down. In the sweater pocket he felt what he believed could be bullets. He then removed the following items from the sweater pocket: handcuff keys, a motel key, two dollars in change, a bottle labeled "Prozac" and a receipt for duct tape.

Other officers, while searching the house for Leonard, noticed an open black purse in a bedroom. Uncertain whether it belonged to the victim, they looked inside. At the top of the purse was a slip of paper with Washington's name printed alongside a list of other names. Beneath the slip of paper were two pieces of identification. They removed both and discovered that they bore the name "Mae Etta Adams," alongside pictures of the woman known as "Michelle."

A grand jury indicted Adams on December 11, 1997, for kidnapping Washington for the purpose of terrorizing her and for armed criminal action. The state filed a superceding indictment on May 10, 1999, alleging alternative bases for the kidnapping charge; namely, for the purpose of holding Washington to give birth and deliver the baby to Adams, or alternatively, for the purpose of terrorizing Washington. Armed criminal action was charged with each alternative kidnapping indictment.

Adams objected to the inclusion of evidence seized during the warrantless search of her home. The trial court received briefs on the motion to suppress, considered the arguments and denied the motion. Trial proceeded and Adams was convicted of kidnapping and armed criminal action. She was sentenced to concurrent terms of twenty years' imprisonment for kidnapping and five years' imprisonment for armed criminal action. Adams now appeals.

In her first point, Adams argues that the trial court erred in denying her motion to suppress evidence. She contends that the warrantless entry onto her property, the protective sweep of her house and the subsequent seizure of evidence violated her right to be free from unreasonable search and seizure, as guaranteed by the Fourth Amendment to the United States Constitution and Article I, Sections 10 and 15 of the Missouri Constitution.

The Fourth Amendment protects an individual only from "unreasonable" searches and seizures. Missouri's constitutional protection is co-extensive with that provided under the United States Constitution. *State v. Deck*, 994 S.W.2d 527, 534 (Mo. banc), *cert. denied*, 528 U.S. 1009, 120 S.Ct. 508, 145 L.Ed.2d 393 (1999). As a general rule, a search conducted outside of the judicial process, without prior approval by a judge or magistrate is *per se* unreasonable. *State v. Tackett*, 12 S.W.3d 332, 337 (Mo.App. W.D.2000). But the state may introduce evidence gathered from an extra-judicial search if the state proves that the search falls within one of the exceptions to the warrant requirement. *Deck*, 994 S.W.2d at 534. The trial court has broad discretion to admit or exclude evidence at trial and this court will reverse only upon a showing of a clear abuse of discretion. *State v. Simmons*, 944 S.W.2d 165, 178 (Mo. banc), *cert. denied*, 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997). Appellate review of the admission of evidence following a ruling on a motion to suppress is limited to determining whether the evidence is sufficient to support the trial court's ruling. *State v. Thompson*, 826 S.W.2d 17, 19 (Mo.App.W.D.1992). Thus, for Adams to prevail on her first point, she must demonstrate that the trial court abused its discretion in concluding that the state justified its warrantless search and seizure.

Adams first argues that the state failed to justify officer Mueller's initial fo-

ray over the privacy fence, his visual inspection of her shed, and the subsequent entry of Mueller and Cromer onto her property. There is no dispute that the police activities constituted a search. But the State argues that "exigent circumstances" justified the warrantless search of a suspect's property. Exigent circumstances exist if the time required to obtain a warrant "would endanger life, allow a suspect to escape, or risk the destruction of evidence because of imminent police." *State v. Hicks*, 853 S.W.2d 955, 956 (Mo. App. E.D.1993). Several factors are considered in determining when exigent circumstances exist, including: (1) the gravity of the offense, (2) whether the subject is reasonably believed to be armed, (3) whether there is a clear showing of probable cause that the suspect committed the offense, (4) whether the subject is inside the premises to be searched, (5) whether the suspect is likely to escape if not apprehended quickly, and (6) whether the entry is made peaceably. *State v. Varvil*, 686 S.W.2d 507, 512 (Mo.App. E.D.1985).

In this case, all six factors are present. Adams concedes that a grave offense was involved, that she was reasonably believed to be armed and in the premises, and that the entry was made peaceably. Adams disputes only whether there was a clear showing of probable cause that she committed the offense and that there was a likelihood that she would escape.

■ Probable cause exists when the "officer's knowledge of the facts and circumstances is sufficient to warrant a prudent person's belief that the suspect is committing or has committed the offense." *State v. Neal*, 849 S.W.2d 250, 258 (Mo. App. W.D.1993). In this case, Mueller received direct statements from Washington that she had been kidnapped, duct taped, handcuffed, and held in a shed over night. Washington's frantic demeanor, the sticky residue on her face, the blue dress and duct tape outside of the fence, as well as Washington's sister's corroboration of her story, provided sufficient evidence to establish probable cause that Adams had kidnapped Washington.

Adams argues that there was no likelihood of escape because the police had her house surrounded. This argument is unpersuasive. When officer Mueller initially climbed the fence and looked into the shed, he was alone. Washington had only recently escaped from confinement in the shed behind Adams's house. Adams may have already, or could easily have discovered this upon inspecting the shed. If she knew that Washington had escaped, she would certainly have a motive to destroy evidence and take flight. Later, when he and Sgt. Cromer decided to return to the house, they were the only two officers present. When Mueller spotted Adams from the backyard and arrested her, he did not know that other officers had arrived at the front of the house. The totality of circumstances here justified Mueller's entry onto the property, his inspection of the open shed, and his re-entry onto the property and arrest of Adams.

■ Adams also argues that the state failed to justify the warrantless "protective sweep" of her property. In *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the United States Supreme Court described a "protective sweep" as "a quick and limited search of the premises, incident to the arrest and conducted to protect the safety of police officers and others." The Court held that a warrantless protective sweep is allowable when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area swept harbors an individual posing a

danger to those on the arrest scene." *Id.* at 334, 110 S.Ct. 1093.

When Sgt. Cromer and others performed the protective sweep, they had reasonable grounds to believe that "Leonard" was in the premises. They also had reasonable grounds to believe that he could be armed, given that the gun described by Washington was not found on Adams. Adams's suggestion that this case is analogous to *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) is baseless. In *Mincey,* an undercover police officer was killed during a controlled drug deal. *Id.* at 387, 98 S.Ct. 2408. The killer was quickly apprehended. *Id.* at 388, 98 S.Ct. 2408. The police then searched the house methodically *for four days,* without ever applying for a warrant. *Id.* at 389, 98 S.Ct. 2408. The Supreme Court held the search to be impermissible. *Id.* at 395, 98 S.Ct. 2408. The sweep through Adam's home was not a methodical four-day search. It was a brief, cursory inspection, reasonably tailored to determine if there was someone in the premises that could pose a danger to people at the crime scene.

■ Adams argues that evidence seized during the course of the protective sweep should have been excluded at trial because it was not in "plain view" and thus the officers were obligated to obtain a search warrant. Under the "plain view" exception to the warrant requirement "an officer who is lawfully located in a place from which the object can plainly be seen may seize the object so long as there is probable cause to believe that the object is connected with the crime." *State v. Johnston,* 957 S.W.2d 734, 742 (Mo. banc) *cert. denied,* 522 U.S. 1150, 118 S.Ct. 1171, 140 L.Ed.2d 181 (1998).

Because the protective sweep was itself justified by the reasonable belief that "Leonard" was in the premises and possibly armed, the officers were lawfully in Adams's residence. *Id.* It is clear that the gun, handcuff key, motel room key and duct tape receipt found in her sweater and coat pockets were not in plain view. The question then is whether the search of the coat and sweater was reasonably related to the purpose of the protective sweep. Sgt. Cromer was told that Adams kept a gun in a blue coat. Upon seeing a blue coat, he had reasonable suspicion, if not probable cause, to "pat-down" or "frisk" the coat for a weapon, and to pat-down the sweater, which was on top of the jacket, for ammunition. Cromer felt what he believed to be a gun in the coat and ammunition in the sweater. Thus, he was entitled to reach into the pockets and inspect their contents. *State v. Rushing,* 935 S.W.2d 30, 33 (Mo. banc 1996). The seizure of the items from Adams's coat and sweater did not violate the Fourth Amendment.

■ Adams's purse was also properly seized because the purse was in plain view, and the evidence most favorable to the state is that there was a sheet of paper on top of the purse, in plain view, bearing the victim's name. The officers did not know whether it belonged to Adams or to the victim. If the purse belonged to Washington, it would be strong evidence that Washington was in the house. If the purse belonged to Adams, it might contain evidence of her identity. The officers investigated further and discovered two forms of identification indicating that the suspect known as "Michelle" was in reality Mae Etta Adams. The purse was reasonably believed to be evidence and in plain view. It would have inevitably been seized, regardless of the officer's warrantless inspection of its contents. *State v, Butler,* 676 S.W.2d 809, 812–13 (Mo. banc 1984). Point denied.

■ In Adams's final point she argues that the court abused its discretion in

precluding cross-examination regarding Washington's history of using weapons, gang membership, thefts, stabbings and drug and alcohol abuse. The only relevance of such information would be to show that Washington was lying when she testified about the kidnapping. But the law is clear: the credibility of a witness cannot be attacked by showing a specific act of immorality (*State v. Schupp*, 677 S.W.2d 909, 913 (Mo.App. E.D.1984)) or by showing that her general moral character is bad (*State v. Miller*, 680 S.W.2d 253, 256 (Mo.App. E.D.1984)). Point denied.

Affirmed.