

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED100009 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court of |
| | ) | St. Francois County |
| v. | ) | |
| | ) | |
| GARY L. FRANCIS, JR., | ) | Honorable Kenneth W. Pratte |
| | ) | |
| Defendant/Appellant. | ) | Filed: April 29, 2014 |

### Introduction

Gary L. Francis, Jr. (Appellant) appeals from the trial court's judgment convicting him of possession of pseudoephedrine with intent to manufacture methamphetamine, Section 195.420.[1] We reverse and remand.

### Factual and Procedural Background

On June 4, 2011, Officer Shannon Sitton (Sitton) of the Missouri State Highway Patrol and the Mineral Area Drug Task Force received information from an informant that a man named James "Patches" Mahurin was planning to cook methamphetamine that evening at a location on Old Bismark Road near State Route B. Sitton was familiar with Patches and believed him to be armed and dangerous. Based upon this information, Sitton grouped other Task Force officers and set up surveillance at approximately 10:30 p.m. Sitton positioned his vehicle in the woods off Old Bismark road. Sitton could see

---

[1] All statutory references are to RSMo 2006, unless otherwise indicated.

flashlights moving in the nearby wooded area. About 10 minutes into the surveillance, he heard a vehicle start up and observed a motorcycle come out of the wooded area and turn onto Old Bismark Road. Sitton called Trooper Jason Coleman (Coleman) and told him to stop the motorcycle if he had probable cause to do so in order to identify the driver. When Coleman saw the motorcycle on Route B, it had no taillights and failed to come to a complete stop at an intersection. Coleman initiated a traffic stop for the infractions. When Coleman activated his emergency lights, the driver did not immediately stop, but slowed down and threw something. The driver then pulled over and was identified as L. Rick Raynor (Raynor). Coleman noticed a strong chemical smell like anhydrous ammonia coming from Raynor's clothing. Coleman knew anhydrous ammonia was used in the production of methamphetamine. Coleman arrested Raynor and then located the items Raynor had thrown, including a syringe, a baggie of methamphetamine, and a piece of foil.

Shortly after the motorcycle left the surveillance area, another vehicle started and drove out of the woods and turned onto Old Bismark Road. Based on the information from the informant, Sitton believed the occupant of this vehicle, a dark colored Camaro, might be Patches. Sitton called Deputy Tim Harris (Harris) and advised him the Camaro was headed in Harris's direction, he believed Patches would be operating the vehicle and that Patches would likely be armed and dangerous. Sitton told Harris if he had a reason to stop the car, he should do so.

Harris followed the Camaro and after observing the vehicle cross over the center line and fail to signal at a turn, decided to stop the vehicle based on those traffic violations. Upon activating his lights, the Camaro promptly pulled over. Gun drawn,

2

Harris ordered the driver to exit the vehicle and to lie down on the ground. The driver complied, almost immediately rolling onto the ground. While doing so, Harris saw something fall out of the driver's lap. Harris recognized Appellant as the driver and handcuffed him. Harris picked up the item that fell, a BlackBerry cellular phone, and observed on the screen, "Delete all messages?"

Harris looked inside the vehicle with the aid of a flashlight, seeing a beer pitcher on the front passenger floorboard, close to the seat and cocked up towards the passenger seat. The Camaro had bucket seats. Harris testified the pitcher had a chemical odor like a solvent consistent with the breakdown of pills. Harris seized the pitcher as evidence. Harris testified at trial there were remnants of a white crust inside the pitcher. Harris testified nothing was blocking Appellant's view of the pitcher nor impeding Appellant's ability to grab the pitcher. Harris testified the vehicle was registered in the names of Gary Francis and Michele Beasley. Harris stated the vehicle registration did not indicate whether the car belonged to Gary Francis, Sr. or Gary Francis, Jr.

Sitton testified he received training in the manufacture of methamphetamine. Pseudoephedrine is the main ingredient that is converted to methamphetamine through a chemical process using a solvent. The pills containing pseudoephedrine are added to the solvent either whole or crushed and the solvent extracts the pseudoephedrine. Sitton testified a plastic container is typically used to crush the pills and a beer pitcher would be sufficient.

Sitton testified he left his surveillance position to determine whether Patches was in the Camaro. Upon learning that it was Appellant in the vehicle, Sitton returned to his original surveillance location. At that time, he saw two individuals walking on Old

3

Bismark Road in the dark without flashlights. The men approached the surveillance vehicle and Sitton observed that the bottoms of their pants were wet and grassy, as if they had been walking through weeds or grass. Sitton requested the men produce their identifications, revealing they were Jeffrey Rulo and Chadley Cramp (Cramp). At that time, Cramp was arrested on an outstanding warrant issued in Iron County.

Sitton testified the officers then drove up the road on which the vehicles had exited the wooded area and stopped at a small camping trailer, consistent with what their informant indicated they would find. Burnt plastic bottles were smoldering in a burn pit in front of the camper. Sitton knocked on the door of the camper but no one responded. Sitton stated he did not know who owned the property and he did not conduct a search because he did not have a warrant. Sitton testified he did not see Patches that evening.

Laura Crandal (Crandal), a criminalist with the Missouri State Highway patrol, testified the pitcher seized from the Camaro contained .02 grams of pseudoephedrine. Crandal testified one gram is equal to the weight of approximately three paperclips but that the crust in the pitcher was visible to her naked eye.

The police obtained a search warrant to download information from the BlackBerry that fell out of Appellant's lap during the traffic stop. Over the defense's objection, Sergeant Donald Crump (Crump), an officer trained in methamphetamine interdiction, testified concerning the information retrieved from the phone. Some of the text messages retrieved from the phone were enlarged and displayed to the jury. Crump stated the cellular phone had a phone number assigned to it but he did not attempt to determine to whom that number was assigned. Crump testified he did not know to whom

4

the phone numbers stored in the phone's memory were assigned beyond how they were designated in the address book.

The State charged Appellant with one count of possession of pseudoephedrine with intent to manufacture methamphetamine. After a trial, the jury found Appellant guilty as charged. The court sentenced Appellant to seven years in prison. This appeal follows.

Additional facts will be set forth in the opinion as necessary to address Appellant's points on appeal.

## Discussion

### Point I – Sufficiency of the Evidence

In his first point on appeal, Appellant argues the evidence was insufficient to support his conviction, in that the evidence did not establish beyond a reasonable doubt that Appellant had knowledge or possession of the pseudoephedrine in the car.

On a challenge to the sufficiency of the evidence, appellate review is limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. State v. Purlee, 839 S.W.2d 584, 587 (Mo. banc 1992). The evidence and all reasonable inferences drawn therefrom are viewed in the light most favorable to the jury's verdict and all contrary evidence and inferences are disregarded. Id.

Appellant was charged with possession of pseudoephedrine with intent to manufacture methamphetamine under Section 195.420, which states:

> It is unlawful for any person to possess chemicals listed in subsection 2 of
> section 195.400, or reagents, or solvents, or any other chemicals proven to
> be precursor ingredients of methamphetamine or amphetamine, as
> established by expert testimony pursuant to subsection 3 of this section,

5

with the intent to manufacture, compound, convert, produce, process, prepare, test, or otherwise alter that chemical to create a controlled substance or a controlled substance analogue in violation of sections 195.005 to 195.425.

Pseudoephedrine is a listed chemical in Section 195.400.2(20) RSMo Supp. 2010.

"Possessed" or "possessing a controlled substance" is defined as

a person, with the knowledge of the presence and nature of a substance, has actual or constructive possession of the substance. A person has actual possession if he has the substance on his person or within easy reach and convenient control. A person who, although not in actual possession, has the power and the intention at a given time to exercise dominion or control over the substance either directly or through another person or persons is in constructive possession of it. Possession may also be sole or joint. If one person alone has possession of a substance possession is sole. If two or more persons share possession of a substance, possession is joint[.]

Section 195.010(34). In determining whether the evidence was sufficient to prove Appellant possessed the pseudoephedrine, this Court applies the same standard of actual or constructive possession used in drug possession cases. See State v. Morgan, 366 S.W.3d 565, 575 (Mo. App. E.D. 2012).

To sustain the conviction, the State must prove (1) conscious and intentional possession of the substance, either actual or constructive, and (2) awareness of the presence and nature of the substance. Purlee, 839 S.W.2d at 587. Both elements may be proved by circumstantial evidence. Id. "The two prongs of this test are not entirely independent." Id. at 588. "Absent proof of actual possession, constructive possession may be shown when other facts buttress an inference of defendant's knowledge of the presence of the controlled substance." Id.

Constructive possession requires, at a minimum, evidence that the defendant had access to and control over the premises where the substance was located. Id. A

6

defendant's exclusive control of the premises is sufficient to raise an inference of possession and control of the substance. Id. A defendant's joint control of the premises, however, requires additional evidence connecting the accused with the substance. Id. Proximity to the contraband alone fails to prove ownership. State v. West, 21 S.W.3d 59, 64 (Mo. App. W.D. 2000). "The State must present some incriminating circumstance that implies that the accused knew of the presence of the drugs and that the same were under his control." Purlee, 839 S.W.2d at 588. Examples of additional incriminating circumstances giving rise to an inference of knowledge and control in a joint possession situation include self-incriminating statements, consciousness of guilt such as flight by the defendant upon realizing the presence of law enforcement officials, routine access to the place where the substance was located, commingling of the substance with the defendant's personal belongings, the presence of a large quantity of the substance, the presence of a chemical odor associated with the manufacture of methamphetamine, and being in close proximity to the substance or drug paraphernalia in plain view. See West, 21 S.W.3d at 63-64; State v. Metcalf, 182 S.W.3d 272, 275 (Mo. App. E.D. 2006); and State v. Mickle, 164 S.W.3d 33, 43-44 (Mo. App. W. D. 2005). The totality of the circumstances is considered in determining whether sufficient additional incriminating circumstances have been proved. Metcalf, 182 S.W.3d at 275.

On appeal, Appellant contends the State's evidence failed to show that he knew of the presence and nature of the pseudoephedrine and, even if he did, his possession was joint and the State did not show a further connection between him and the substance. The State contends this is a case of actual possession or, in the alternative, a case of constructive possession.

7

We disagree with the State's assertion that Appellant had actual possession of the pseudoephedrine, as the substance was neither on Appellant's person nor within his easy reach and convenient control. While Deputy Harris testified there was nothing blocking Appellant's view of the pitcher nor impeding Appellant's ability to grab the pitcher while in the vehicle, this does not necessarily translate into a finding that the pitcher was within Appellant's easy reach and convenient control. The evidence at trial was that the Camaro had bucket seats and the pitcher was on the passenger seat floorboard. Without more, the facts do not support a finding that Appellant, as the driver of the vehicle, had actual possession of an item located somewhere on the passenger side floorboard.

The State did, however, present sufficient evidence from which a reasonable juror could find that Appellant had constructive possession of the substance and knowledge of the presence and nature of the substance. Appellant jointly owned the vehicle with another person [2] but at the time of arrest was the lone occupant of the vehicle. Appellant's joint ownership of the vehicle coupled with his exclusive possession of the vehicle at the time of the stop suggests Appellant had routine access to the vehicle. Furthermore, the evidence at trial was that the pitcher contained a white crust that was visible to the naked eye of the criminalist; was emitting a chemical odor; and was in relatively close proximity to Appellant and in plain view.

Based on the totality of the circumstances, and viewing the evidence and all reasonable inferences in the light most favorable to the verdict, the State presented

---

[2] As already noted, the vehicle was registered to Gary Francis and Michele Beasley. Appellant asserts on appeal there is no evidence that the "Gary Francis" on the registration was him and not his father, Gary Francis, Sr. During closing arguments, however, defense counsel conceded that the car was registered to Appellant. Although there is a single address listed on the registration, there is no evidence of what Michele Beasley's relationship is to Appellant.

sufficient additional incriminating circumstances from which a reasonable juror might have found that Appellant was aware of the presence and nature of the substance and had constructive possession of the substance. The trial court did not err in overruling Appellant's motion for judgment of acquittal at the close of all the evidence. Appellant's Point I is denied.

Point II –Plain Error in Admission of Evidence

Next, Appellant argues the trial court plainly erred in admitting all evidence of the pitcher found in the Camaro and its contents, in violation of his rights to be free from unreasonable search and seizures, in that the officer did not have probable cause to search his vehicle because he was stopped for minor traffic violations and no exigent circumstances existed that would have justified a warrantless search.

Appellant concedes he did not properly preserve this issue for appeal by seeking to suppress the evidence or by objecting to the introduction of the evidence at trial. State v. Nylon, 311 S.W.3d 869, 884 (Mo. App. E.D. 2010). As such, the claimed error may only be reviewed for plain error. Id. Under the plain error standard, we will reverse only when a plain error affecting a substantial right results in manifest injustice or a miscarriage of justice. Id.; Rule 30.20.[3] Plain error is that which is evident, obvious, and affects substantial rights of the defendant. State v. Chism, 252 S.W.3d 178, 183 (Mo. App. W.D. 2008).

The Fourth Amendment of the United States Constitution protects an individual from unreasonable searches and seizures. U.S. Const. amend. IV; State v. Adams, 51 S.W.3d 94, 98 (Mo. App. E.D. 2001). The Constitution of Missouri provides coextensive

[3] All rule references are to Mo. R. Crim. P. 2012, unless otherwise indicated.

protection to the United States Constitution. Mo. Const. art. I, §15; Adams, 51 S.W.3d at 98.

"A routine traffic stop based on the violation of state traffic laws is a justifiable seizure under the Fourth Amendment." State v. Barks, 128 S.W.3d 513, 516 (Mo. banc 2004). "'[S]o long as the police are doing no more than they are legally permitted and objectively authorized to do, [the resulting stop or] arrest is constitutional.'" Id., quoting State v. Slavin, 944 S.W.2d 314, 317 (Mo. App. W.D. 1997). "The detention may only last for the time necessary for the officer to conduct a reasonable investigation of the traffic violation[.]" Barks, 128 S.W.3d at 516.

Generally, warrantless seizures are unreasonable and unconstitutional. State v. Norfolk, 366 S.W.3d 528, 533 (Mo. banc 2012). However, an officer may conduct a brief investigative detention of an individual if the officer has a reasonable suspicion, based on specific and articulable facts, that illegal activity has occurred or is occurring. Id., quoting Terry v. Ohio, 392 U.S. 1, 21 (1968).

The evidence at trial was that Officer Sitton called Deputy Harris and advised him that a Camaro believed to be operated by Patches was headed in Harris's direction and that Harris should stop the vehicle if he had a reason to do so. Harris initiated a traffic stop of the Camaro after observing the driver commit several traffic violations. Appellant exited the vehicle as ordered and was secured by the officer. At this point, Deputy Harris looked inside the vehicle with a flashlight and saw a beer pitcher on the passenger side floorboard. Deputy Harris seized the pitcher as evidence. Deputy Harris testified the pitcher had a chemical odor like a solvent consistent with the breakdown of pills and there were remnants of white crust inside the pitcher. Crandal, a criminalist with the

10

Missouri State Highway patrol, testified that the crust on the pitcher was visible to her naked eye.

Appellant argues the trial court plainly erred in allowing the State to admit the pitcher and its contents into evidence because Deputy Harris lacked probable cause to search the vehicle and seize the evidence. Appellant's point is based on his assertion that Deputy Harris's act of looking into the vehicle with a flashlight constituted a search.

This assertion, however, is incorrect. "'Observation of that which is open to view is not a search. A search (such as is prohibited by the constitutional provisions invoked) is not made by merely looking at that which can be seen.'" State v. Reagan, 328 S.W.2d 26, 28-29 (Mo. banc 1959), quoting State v. Hawkins, 240 S.W.2d 688, 692 (Mo. banc 1951). The fact that Deputy Harris utilized a flashlight is of no moment, as "[t]he use of a flashlight to see that which would be in plain view in the daytime does not convert that which would not be a search in daylight into a search in the Constitutional sense, at nighttime." State v. Cobb, 484 S.W.2d 196, 199 (Mo. banc 1972); see also State v. Burkhardt, 795 S.W.2d 399, 407 (Mo. banc 1990) (looking into an automobile with a flashlight to view object open to public view is not search within the purview of the Fourth Amendment).

Upon Deputy Harris's observation of the pitcher, "[t]he inquiry…is whether the discovery of the evidence under the circumstances would warrant a police officer of reasonable caution to believe that an offense has been or is being committed and that the object in plain view is evidence which incriminates the accused." State v. Gibbs, 600 S.W.2d 594, 598 (Mo. App. W.D. 1980). The evidence at trial was that methamphetamine producers will sometimes crush pills containing pseudoephedrine in

11

plastic containers, there was a visible white crust on the pitcher, the pitcher was emitting a chemical odor consistent with solvents used to break down pills, and Deputy Harris knew Appellant has recently left a site where it was suspected methamphetamine was being produced. The cumulative facts and information introduced at trial could support a finding that a reasonable officer believed that an offense had been or was being committed and thus could justify his seizure of the incriminating evidence.

We find Appellant has failed to demonstrate that admission of the evidence was an evident and obvious error. Appellant's Point II is denied.

### Point III – Admission of Text Messages

In his final point, Appellant argues the trial court erred and abused its discretion in admitting evidence of text messages received on the BlackBerry because this denied him his rights to due process of law, to a fair trial before a fair and impartial jury, and to confront the witnesses against him, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 18(a) of the Missouri Constitution, in that the texts constituted hearsay from both known and unknown persons.

The trial court has broad discretion when ruling on the admission or exclusion of evidence at trial, and this Court will not disturb the court's ruling absent a showing of an abuse of that discretion. State v. Edwards, 116 S.W.3d 511, 532 (Mo. banc 2003). We will reverse on claims of error in the admission of evidence only if the error was so prejudicial that it deprived the defendant of a fair trial. State v. Robinson, 111 S.W.3d 510, 513 (Mo. App. S.D. 2003). There is no reversible error if the evidence is competent under any theory or for any purpose. Id.

12

At trial, Crump testified he downloaded the contacts, SMS text messages, call logs, images and videos from the BlackBerry phone. This information was part of a phone examination report admitted as Exhibit 5 at trial. The phone included contacts by the names of Patch, Chad, Ricky Raynor and Amanda. The text messages on the phone ranged from June 2, 2011 at 6:18 p.m. to June 4, 2011 at 1:43 p.m. Crump opined that the "time of the [last] text message" was consistent with someone deleting the most recent text messages first and then working backwards. The following text messages were enlarged and displayed to the jury, as Exhibits 6 and 7.

| # | Number | Name | Date & Time | Status | Text |
|---|--------|------|-------------|--------|------|
| 1 | 15739158753 | Patch | 06/02/11 18:18:20 | Read | Just got out of shower not getting out you can come by and do one |
| 2 | 15739158753 | Patch | 06/02/11 18:25:49 | Sent | Need eny thing from station or dose chad |
| 3 | 15739158753 | Patch | 06/02/11 18:26:43 | Read | No |
| 4 | 15733302712 | Chad | 06/02/11 18:46:21 | Read | Wat up |
| 53 | 15737015392 | N/A | 06/03/11 09:23:56 | Read | Hey man are you gonna make this right? Every bit of that was bunk. I just gave you 100 bucks for absolutly nothing you need to call me |
| 61 | 15737015392 | N/A | 06/03/11 11:37:22 | Read | r u gonna make this rite that isnt my money |
| 71 | 15737477012 | N/A | 06/03/11 16:40:48 | Read | I need you to texed me about boxes igit paied tomorow and i am gitting a bunch will you still take them |
| 77 | 15737477012 | N/A | 06/03/11 16:48:57 | Read | I didnt have the money today but i git paid in the morning and im going to git a bunch just wanted to see whats up on that |
| 78 | 15737477012 | N/A | 06/03/11 16:53:24 | Read | Not mad buy wy did i git the bag i got the other day that dident have the real in it i can help you a lot in some ways |
| 79 | 15737477012 | N/A | 06/03/11 16:55:32 | Sent | if you got something bad from me irt wasn't ment for you that's real |

| | | | | | talk |
|---|---|---|---|---|---|
| 81 | 15737477012 | N/A | 06/03/11 17:01:30 | Read | I didn't think you did it but that bag did not have any stuff in it it was something else no tast no smell nothing can we fix that im not trying to start something just being onist |
| 82 | 15737477012 | N/A | 06/03/011 17:03:07 | Sent | I didn't go out to night but tomarrow will be made wrifght |
| 83 | 15737477012 | N/A | 06/03/11 17:05:35 | Read | Thats cool i will bring that bag back to you so you can see i am not fucking you |
| 84 | 15737477012 | N/A | 06/03/11 17:06:17 | Sent | I belive you |
| 85 | 15737477012 | N/A | 06/03/11 17:12:25 | Read | I like the first stuff that brought back some old times i will show you i can be a friend that your not looking over your sholder makeing shore nothing is being fucked with |
| 87 | 15737477012 | N/A | 06/03/11 17:14:44 | Read | You dont have anthing now |
| 88 | 15737477012 | N/A | 06/03/11 17:15:45 | Sent | Wish I did crashing out much needed |
| 89 | 15737477012 | N/A | 06/03/11 17:17:12 | Read | I here you dont like it eather |
| 90 | 15737477012 | N/A | 06/03/11 17:18:30 | Read | So festus had twelve hour now |
| 91 | 15737477012 | N/A | 06/03/11 17:19:08 | Sent | Nope |
| 92 | 15737477012 | N/A | 06/03/11 17:23:46 | Unsent | About I'll text in mornbin |
| 93 | 15737477012 | N/A | 06/03/11 17:31:15 | Read | Festus had twelve hour now because they will be my first stop if so you talking about red hots in arnald |
| 94 | 15737477012 | N/A | 06/03/11 17:35:03 | Read | Im not trying to bother you just make shore whare im going tomorow |
| 111 | 15737477012 | N/A | 06/04/11 2:21:42 | Read | Can you do that small one untell i git those for you today so we have a little to run on |
| 112 | 15737477012 | N/A | 06/04/11 02:29:31 | Read | Are you there bubba |
| 113 | 15737477012 | N/A | 06/04/11 02:30:10 | Sent | Yerp |
| 119 | 15737477012 | N/A | 06/04/11 | Read | Did festus have twelve hour |

| | | | 06:33:24 | | |
|---|---|---|---|---|---|
| 126 | 15737477012 | N/A | 06/04/11 08:52:32 | Read | I got two now and going after another are you hedding out soon |
| 127 | 15737477012 | N/A | 06/04/11 08:55:19 | Read | Do you just want thos two now are do you want to wait til i git back |
| 129 | 15737012084 | Amanda | 06/04/11 9:00:01 | Read | I will have that script on monday. I fucked up my days. Sorry. |
| 130 | 15737477012 | N/A | 06/04/11 9:00:40 | Read | Do you want me to meet you are wait |
| 135 | 15737477012 | N/A | 06/04/11 09:06:33 | Read | Igot two you want them |
| 136 | 15737477012 | N/A | 06/04/11 09:07:06 | Sent | Shure |
| 137 | 15737477012 | N/A | 06/04/11 09:08:20 | Read | Can igit some tonight |
| 138 | 15737477012 | N/A | 06/04/11 09:09:28 | Sent | I'm gona try to go soon |
| 139 | 15737477012 | N/A | 06/04/11 09:10:57 | Read | Do you need those now |
| 140 | 5739158753 | Patch | 06/04/11 9:12:27 | Sent | Iv got five what ya wana do big honky |
| 141 | 15737012084 | Amanda | 06/04/11 9:13:13 | Read | By wednesday or thursday I will have that other script also |
| 142 | 15737012084 | Amanda | 06/04/11 9:13:40 | Sent | K |

Some of the messages were read into evidence by Crump using the phone examination report. Crump testified, based on his training and experience, that "do one" means Appellant could come by and cook methamphetamine; "bunk" means bad product or drugs; "real" means real methamphetamine; "crashing out" means coming down off a high; and "small one" means making a small batch of methamphetamine. Crump stated "boxes," "get a bunch," "12 hour," "red hots," and "script" are all references to pseudoephedrine pills. Crump testified it was not unusual for someone from St. Francois County to travel as far as Arnold to acquire pseudoephedrine to make methamphetamine or for several people to gather pseudoephedrine from various locations. During direct

examination, the State elicited testimony from Crump that some of the text messages indicated the cellular phone owner "meant to cheat" his buyer.

Crump testified the BlackBerry had a phone number assigned to it but that he did not attempt to determine whether that phone number was assigned to any individual. Crump stated that "N/A" on the phone examination report means there was no name assigned to the phone number by the BlackBerry's user. Crump testified he did not know who the unassigned phone numbers belonged to and that he "didn't run the numbers out to see who was paying for the phones[.]"

On March 27, 2013, prior to trial, Appellant filed a motion in limine seeking to exclude evidence of the content of the phone examination report asserting the messages sent to the phone were inadmissible hearsay from unknown persons and were irrelevant, speculative in nature and more prejudicial than probative. Appellant further argued the State's late disclosure of the report, created on June 10, 2011 and disclosed three weeks before trial on March 5, 2013, prejudiced him by undermining his right to effective assistance of counsel by denying him time to investigate the report and attempt to identify the sender of the messages.

Appellant's motion was argued during the pre-trial conference on the day of trial. Defense counsel again asserted the text messages were inadmissible hearsay, stressing that the senders of the messages being admitted were unidentified. At that time, the State argued the texts were admissible under the co-conspirator exception to the hearsay doctrine, that it was unnecessary to identify the co-conspirators under the exception, and that the texts were relevant to show Appellant's intent. Defense counsel countered that there was no evidence the phone belonged to Appellant; that the incoming messages from

16

other parties, particularly unknown parties, were hearsay; deciphering the messages called for speculation; that the messages were not relevant because they were too remote in time to the alleged offense and it was impossible to determine if the messages were in regard to the current charges or to prior or future incidents; and constituted inadmissible evidence of prior bad acts. In response to the defense's contention that the State could not establish that Appellant owned the phone, the State argued "[w]e can make a logical inference that he was the owner of the BlackBerry, since it was in his possession at the time." The trial court found the texts were admissible because they were "not really hearsay" under the co-conspirator exception; that given the time frame, the references to purchasing pseudoephedrine were not evidence of prior uncharged bad acts; and the evidence was legally and logically relevant to prove intent. Appellant included the erroneous admission of the messages in his motion for acquittal or, in the alternative, for a new trial.

Appellant argues on appeal that the trial court erred and abused its discretion in admitting evidence of the text messages received on the phone because the texts constituted hearsay from both known and unknown persons, and they were not admissible under the co-conspirator exception because the State did not establish a conspiracy independently of the statements in the texts. The State abandons its theory of admission based on the co-conspirator doctrine and now asserts the text messages were admissible as admissions against interest as they demonstrated Appellant's involvement in illegal drug activity.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. State v. Douglas, 131 S.W.3d 818, 823 (Mo. App. W.D. 2004). Hearsay

17

statements are, as a rule, inadmissible. Id. This rule is predicated on a criminal defendant's Sixth Amendment right to confront and cross-examine the witnesses against him. Id.

On appeal, the State argues the text messages were admissible as "admissions against interest," citing as its primary source of authority State v. Spica, 389 S.W.2d 35, 47 (Mo. 1965) and this Court's adoption of Spica's reasoning in State v. Mosier, 738 S.W.2d 549, 555-56 (Mo. App. E.D. 1987) (holding tape recordings of telephone and in person conversations between defendant and an informant were not inadmissible hearsay as defendant was sufficiently identified as the seller on the recordings through the police officers' identification of defendant's voice, and defendant's statements were admissible as declarations against interest and the informant's statements were admissible as being necessary to obtain the full significance and meaning of defendant's declarations).

In Spica, the State introduced testimony of a police officer as to a conversation he overheard between the defendant and his accomplice-turned-informant, Mrs. Myszak (Myszak), and tape recordings of five different conversations between defendant and Myszak. Spica, 389 S.W.2d at 43. Myszak did not testify at trial and, on appeal, Spica challenged the admission of the evidence as hearsay. Id. at 46-47. The Missouri Supreme Court held that Spica's statements, which consisted of his part in the conversation, as testified to by the officer and presented to the jury via sound recordings, were admissible in evidence as "admissions against interest," an exception to the hearsay rule. Id. at 46. The court stated the rule as follows:

> Statements, declarations, and admissions by accused from which an inference of guilt may be drawn are admissible in evidence against him. Such evidence is admissible as an exception to the hearsay rule, without regard to whether or not it constitutes a part of the res gestae.

18

Id., quoting 22A C.J.S. Criminal Law § 730. Further, the court found Myszak's statements were also admissible as an exception to the hearsay rule, holding:

> Where a statement in the nature of an accusation is made to accused and he replies thereto otherwise than by unequivocally denying the accusation in toto, as where he assents to the truth of the charge in whole or in part, or admits it in part and denies it in part, or where he makes an evasive or equivocal reply, or where he follows the denial with an admission of certain facts, the statement and the reply thereto may be received and considered against him to the extent that he admits the truth of the charge, the admission being evidence, and the statement not being direct evidence but admissible only in connection with the reply.

Spica, 389 S.W.2d at 47, quoting 22A C.J.S. Criminal Law § 734(2). The court found the conversations, consisting of numerous statements on the part of Myszak and statements in reply by the defendant, amounted to declarations against interest and that the statements of Myszak were admissible to obtain the full significance and meaning of Spica's declarations. Spica, 389 S.W.2d at 47.

Although this Court agrees with the underlying rationale of Spica, both the law and technology have evolved in the decades since it was decided, which presents issues not adequately addressed by the State. The statements which the Spica court referred to as "admissions against interest" are today more commonly described as "admissions of a party opponent." State v. Brown, 833 S.W.2d 436, 438 (Mo. App. W.D. 1992); State v. Simmons, 233 S.W.3d 235, 237 (Mo. App. E.D. 2007). This is distinguishable from a "declaration against interest" which is a statement made by an unavailable non-party that may be admissible as an exception to the hearsay rule. Brown, 833 S.W.2d at 438.

19

An admission of a party opponent, however, is not properly considered to be hearsay at all. Id., citing IV Wigmore, Evidence § 1048 at 4 (1972) and Fed. R. Evid. 801(d)(2) and 804(b)(3).[4] See also Simmons, 233 S.W.3d at 237.

> The reason is that the hearsay rule is designed to protect a party from out-of-court declarations of other persons who cannot be cross-examined as to the bases of their perceptions, the reliability of their observations, and the degree of their biases. In the case of an admission of a party opponent, however, the declarant is the party himself. Because the statement is being offered against him, he is the only one who can object to its admission; and an objection on the basis of hearsay cannot make sense because the party against whom it is offered *does not need to cross-examine himself*. He already knows why he said what he said when he said it. IV Wigmore, § 1048 at 4.

Brown, 833 S.W.2d at 438-39 (emphasis in original).

The second category of statements recognized by Spica, i.e., the statements of third parties that are admissible to give context to a defendant's admission, are today more commonly referred to as adoptive admissions or, in Missouri, tacit admissions. State v. Gilmore, 22 S.W.3d 712, 718 (Mo. App. W.D. 1999) ("A defendant's failure to deny an incriminating statement made in his presence can constitute a tacit admission."). Under the adoptive admission rule, a statement of another person is admissible as evidence against a criminal defendant when the defendant assents to or adopts the statement made by the other person through the defendant's words or conduct. 23 C.J.S. Criminal Law Section 1231 (March 2014). The adoptive admission rule may allow admission into evidence of a defendant's failure to deny statements made in his presence which tend to incriminate him and which a reasonable person would have denied under the circumstances. Id.

---

[4] See 23 C.J.S. Criminal Law Section 1220 (March 2014), analyzing Fed. R. Evid. 801(d)(2) and similar state laws, and discussing the circumstances in which an admission by an accused offered against them at trial is either not hearsay or is viewed as an exception to the hearsay rule.

With these concepts in mind, we look to the State's justification for admitting the out-of-court statements of non-testifying third parties. The crux of the State's argument is that the text messages sent from the BlackBerry were admissible as Appellant's admissions while the incoming messages were admissible to give context to those admissions. We find numerous flaws in the State's reasoning.

First and foremost is the fundamental failure of the State to establish at trial that the outgoing text messages were written by Appellant. This failure is accentuated by the modern authority on admissions by a party opponent, particularly those involving written electronic communications. By definition, for a statement to be admitted as an admission of a party opponent, the party seeking to admit the evidence must present evidence showing that *the opposing party made the statement*. When defense counsel raised this issue at trial, the State responded that there was "a logical inference that [Appellant] was the owner of the BlackBerry, since it was in his possession" at the time of arrest. We disagree, and find the State's position is inconsistent with the requirement of authentication of documents, a necessary step in laying the foundation for the admission of such evidence at trial.

In State v. Harris, 358 S.W.3d 172, 175-76 (Mo. App. E.D. 2011), this Court considered the foundation requirements for the admission of text messages at trial. In finding the rules of admissibility for personal letters applicable to the content of text messages from a cellular phone, this Court stated:

> ...The authenticity of a document cannot be assumed. *Robin Farms, Inc. v. Bartholome*, 989 S.W.2d 238, 252 (Mo. App. W.D. 1999). The proponent of the document must offer proof that it is what it purports to be. *Id.* "The law is well settled that the mere fact that a letter purports to have been written and signed by one in authority to do so is, in itself, insufficient to establish the authenticity and genuineness of the letter." *Id.*

21

Applying these rules to text messages, the proponent of such evidence must present some proof that the message[s] were actually authored by the person who allegedly sent them. This should not be an unduly burdensome requirement and can be satisfied by circumstantial evidence. Proof could be in the form of admission by the author that he actually sent them, or simply an admission by the author that the number from which the message was received is his number and that he has control of that phone. Such proof could even be established by the person receiving the message testifying that he regularly receives text messages from the author from this number, or something distinctive about the text message indicating the author wrote it, such as a personalized signature. Once the evidence is admitted, it is still the province of the jury to determine its weight.

Harris, 358 S.W.3d at 175-76.

This Court's finding in Harris is consistent with precedent from other jurisdictions addressing the admissibility of text messages against a defendant as an admission of a party opponent. See State v. Thompson, 777 N.W.2d 617, 622-26 (N.D. 2010) (trial court admitted messages as "declarations against interest," appellate court analyzed law of other jurisdictions regarding authentication of electronic messages and found sufficient evidence of authorship by defendant given the circumstances and victim's testimony that messages came from the defendant's phone number and included her distinctive signature); State v. Winder, 189 P.3d 580 (Kan. App. 2008) (text messages admissible as a party admission and finding messages were properly authenticated when witness testified the incriminating messages were received from defendant's phone number and she had recently received a call from defendant from that number); Symonette v. State, 100 So. 3d 180, 183-84 (Fla. App. 4th Dist. 2012) (text messages admissible as admission of party and properly authenticated when accomplice identified the text messages as between her and defendant at trial); State v. Roseberry, 967 N.E.2d 233, 243-44 (Ohio App. 8th Dist. 2011) (holding text messages that were not authenticated by the recipient of the messages were not admissible as statement of party opponent);

Pavlovich v. State, 49A02-1308-CR-715, 2014 WL 1266266 (Ind. App. 2014) (discussing authentication of electronic communications and finding admitted messages had been properly authenticated and were admissible as statements of party opponent); State v. Franklin, 280 Kan. 337, 337 (Kan. 2005) (affirmed the admission of text messages, finding sufficient evidence to reasonably imply defendant sent the messages, in that content of the messages paralleled other evidence of defendant's activities and statements; recipient of the messages testified he and defendant sometimes communicated by text message and messages came from telephone number he knew belonged to defendant; and defendant had the phone in her possession when she was arrested, contrary to her claim that she did not).

In Com. v. Koch, 39 A.3d 996, 1000 (Pa. Super. 2011), the defendant was convicted of possession with intent to deliver and possession of a controlled substance as an accomplice. On appeal, the defendant challenged the admission at trial of drug-related text messages from her phone, contending the messages were not properly authenticated as there was no evidence substantiating that she was the author of the messages and the messages were inadmissible hearsay. Id. at 1002, 1005. The appellate court reversed, finding merit to both contentions. Id. at 1005-07. The court addressed the question of authentication of text messages as an issue of first impression, finding precedent from Pennsylvania and other states relied upon the principle that e-mails and text messages are documents subject to the same general requirements for authenticity as non-electronic documents. Id. at 1003-04. The Koch court stated:

> As these cases illustrate, the difficulty that frequently arises in e-mail and text message cases is establishing authorship. Often more than one person uses an e-mail address and accounts can be accessed without permission. In the majority of courts to have considered the question, the

mere fact that an e-mail bears a particular e-mail address is inadequate to authenticate the identity of the author; typically, courts demand additional evidence.

Text messages are somewhat different in that they are intrinsic to the cell phones in which they are stored. While e-mails and instant messages can be sent and received from any computer or smart phone, text messages are sent from the cellular phone bearing the telephone number identified in the text message and received on a phone associated with the number to which they are transmitted. The identifying information is contained in the text message on the cellular telephone. However, as with e-mail accounts, cellular telephones are not always exclusively used by the person to whom the phone number is assigned.

Id. at 1004-05.

The Koch court found the trial court erred in admitting the text messages into evidence because although the defendant acknowledged ownership of the phone, a police officer conceded that the author of the drug-related messages could not be ascertained and some of the messages referred to the defendant in the third person, indicating she did not write some of the messages. Id. at 1005. The court found that authentication of electronic communications requires more than mere confirmation that the number belonged to a particular person and that additional evidence which tends to corroborate the identity of the sender is required. Id. at 1005. The court noted there was no testimony from the persons who sent or received the text messages and no contextual clues in the messages tending to reveal the identity of the sender. Id. The court held that Appellant's physical proximity to the telephone at the time of arrest was of no probative value in determining whether she authored text messages days or weeks before. Id. The court further held that the messages were not admissible as admissions of a party opponent because the State was unable to prove the defendant was the author of the messages. Id. at 1006.

24

In the instant appeal, the State maintains the text messages were properly admitted based solely on the contention that the texts were admissible as Appellant's admissions. This position is wholly unsupported by the record because the State failed to present evidence that Appellant authored the messages at trial.

It was the State's position at trial that Appellant's ownership of the BlackBerry, and presumably his authorship of the outgoing messages, could be inferred since the phone was in his possession at the time of arrest. Harris, however, holds otherwise, requiring the "proponent of such evidence [to] present some proof that the message[s] were actually authored by the person who allegedly sent them." Harris, 358 S.W.3d at 175-76. In this case, the messages were sent and received hours and, in some cases, days before Appellant's arrest. When questioned at trial, Crump testified he *did not even attempt* to determine ownership of the BlackBerry or the identity of the persons sending messages to the BlackBerry. It appears the State made little or no effort before trial to establish the identity of the senders of any of the messages, and certainly did not present any evidence that tended to establish that any of the messages were sent by Appellant.

Authorship is what distinguishes this case from the situations in Spica, 389 S.W.2d 35, and Mosier, 738 S.W.2d 549. Spica involved the recording or relation of in-person conversations between two people. Mosier involved recordings of in-person and one-on-one telephone conversations where witnesses identified the defendant by voice. In those cases, the State presented evidence which tended to establish that the defendant made the statements sought to be entered. Here, the State presented no such evidence. There was no evidence that Appellant owned the BlackBerry or, more importantly, authored the messages. The fact that Appellant possessed the phone at the time of arrest

25

is insufficient by itself to establish that Appellant authored text messages sent hours or days earlier. Because the State failed to establish that the text messages were authored by Appellant, the outgoing messages were not admissible as admissions by a party opponent and, thus, the incoming messages were not admissible under any identified exception to the hearsay rule.

In addition to failing to prove Appellant authored the messages, the State's position that the texts were admitted as Appellant's admissions is further undermined by a review of the evidence presented at trial. Whether called an admission against interest, an admission of a party opponent, an adoptive admission or a tacit admission, evidence of a third party's statement to a defendant is admissible only to give context to the defendant's reply. See Spica, 389 S.W.2d at 47 (accusatory statement made to defendant is "admissible only in connection with the reply" and is not direct evidence) and Gilmore, 22 S.W.3d at 718 (finding witness's testimony as to out-of-court statements between third party and defendant were admissible as tacit admission of defendant).

During the State's direct examination of Crump, however, the questions were almost exclusively focused on the incoming text messages, not on the messages sent from the BlackBerry. With very limited exceptions, the State did not elicit testimony of Appellant's alleged responses to the incriminating messages, instead focusing on the statements of frequently unknown, unidentified third parties. In addition to Officer Crump's testimony, the State displayed to the jury two enlarged exhibits, Exhibits 6 and 7, with the previously set forth messages. While Exhibits 6 and 7 include some messages sent from the BlackBerry (11 of the 39 messages entered into evidence), when compared to the full phone examination report, it becomes clear the State was not seeking to admit

the texts as Appellant's admission. Specifically, the State repeatedly entered into evidence incriminating incoming messages *but did not admit the outgoing message from the BlackBerry that would arguably be responding to that message*. The intent of such action is clear; the State was not seeking to introduce evidence of Appellant's alleged admissions, but instead was seeking to admit the hearsay statements of unidentified third parties.

Based on the foregoing, we find the trial court erred and abused its discretion in admitting the text messages into evidence at trial.

## Prejudice

Having found the trial court erred in admitting the text messages at trial, this Court must determine whether the error requires reversal.

If inadmissible hearsay evidence is improperly admitted, reversal is not required unless the error was prejudicial to the defendant such that the error was outcome-determinative. Douglas, 131 S.W.3d at 824. "[T]he mere fact that there is overwhelming evidence of guilt is not the test; the test is whether there is a reasonable probability the jury relied on the improperly admitted evidence in convicting the defendant and that it would have reached a different result but for its admission." Id. at 825.

We find the improper admission of the text messages at trial was outcome-determinative and prejudicial to Appellant. The evidence of Appellant's guilt of possession with intent to manufacture consisted of his leaving the site of a suspected, but not demonstrated, methamphetamine cook and his constructive possession of a .02 gram residue of a precursor recovered from jointly owned property. The evidence of Appellant's guilt was slight while the improperly admitted evidence was plentiful and

damaging. There is a reasonable probability that the jury relied on the text messages in convicting Appellant and that it would have reached a different result but for their admission. Appellant's Point III is granted.

Conclusion

The judgment of the trial court is reversed and remanded.

Sherri B. Sullivan, J.

Lawrence E. Mooney, P.J., and
Robert G. Dowd, Jr., J., concur.